**Affirmed and Memorandum Opinion filed December 20, 2018**



In The

# Fourteenth Court of Appeals

### NO. 14-18-00582-CV

## IN THE INTEREST OF K.L.P., AND K.M.R.N., A/K/A K.M.N., CHILDREN

**On Appeal from the 313th District Court
Harris County, Texas
Trial Court Cause No. 2014-00464J**

## M E M O R A N D U M   O P I N I O N

N.P.N. (Mother) appeals the trial court's decree terminating her parental rights as to her daughters K.L.P. (Kimberly) and K.M.N. (Kandace).[1]  J.W.N. (Father) appeals the trial court's decree terminating his parental rights to his daughter Kandace.[2]  On appeal, Mother and Father challenge the legal and factual sufficiency of the evidence to support the (1) predicate grounds under which their parental rights

---

[1] We use pseudonyms to refer to appellant, the children, and other family members. See Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8.

[2] Father is not the natural parent of Kimberly. The trial court terminated Kimberly's father's rights, and he has not appealed.

were terminated and the (2) finding that termination was in their daughters' best interest. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Department History

In August 2013, three days before Mother gave birth to Kandace, the Department received a referral alleging neglectful supervision of Kimberly by Mother and Father. The referral alleged that Mother and Father could be heard yelling at each other from outside their home. When law enforcement arrived at the residence, Mother's nose was scratched and bleeding. Kimberly told law enforcement that she heard Mother and Father yelling and screaming at each other while she was playing in the bedroom. She then went into the living room where she saw Father and Mother arguing over a cellular telephone. Father grabbed the telephone from Mother and scratched her on the nose, causing her to bleed. Mother refused to press charges against Father. Father denied hitting Mother and claimed Mother was screaming and banging on the walls because he refused to give her money to buy cigarettes. At the time, Father was under an order of deferred adjudication for a 2011 plea of "guilty" to a charge of assault against Mother.

Due to the referral and the parents' history of domestic violence, the trial court ordered the parents to participate in domestic violence classes, parenting classes, psychological evaluations, and random drug testing. Mother expressed reluctance to complete the services. Both parents voiced a lack of understanding as to why they were required to complete the services. Father complained he had already taken the domestic violence class as a part of his deferred adjudication sentence, and Mother did not believe any of it was relevant to her actions. In October of 2013, the trial court vacated its order to participate.

In January 2014, the Department received a referral alleging that Mother had attempted to "overdose" with pills a month earlier. The report further alleged that Father threw "objects" at Mother and told her that he would "chop her up into pieces while her children were present." The report stated Mother did not call the police because she did not want "to get Father in trouble." The intake also alleged that sometime in March of 2013 Father pushed Mother while she was pregnant.

The Department determined it was necessary to remove Kimberly and Kandace from Mother and Father and appoint the Department as temporary managing conservator of the girls. Mother and Father were appointed possessory conservators with supervised visitation and given family service plans to complete.

Over the course of two years, Mother and Father completed their services to the satisfaction of the Department. However, during that time, Mother was arrested twice for trespassing. It was determined that Mother was suffering from undiagnosed schizophrenia and was in a state of psychosis when the trespassing incidents occurred. Mother began taking medication to alleviate the symptoms of her schizophrenia.

Two years after the girls were removed from Mother and Father, the Department filed a motion to modify conservatorship, alleging that circumstances had materially and substantially changed. Mother and Father were appointed joint permanent managing conservators of both girls. Kimberly and Kandace were returned home. Mother enrolled Kimberly in the third grade.

Ten months after the girls were returned home, the Department received a referral alleging physical abuse of Kimberly and Kandace by Father. Specifically, Kimberly said Father punched her in the nose causing it to bleed profusely. The referral further alleged that Kimberly said Father picks Kandace up by her collar when he is angry. Moreover, the referral stated there have been numerous attempts

3

by Kimberly's school to have Mother address Kimberly's poor hygiene.

The Department received a second referral a month later, alleging physical abuse of Kimberly by Mother and Father. This referral alleged Kimberly has been identified at school as emotionally disturbed, refuses to make eye contact, does not ask permission to use the restroom at school, which results in her soiling herself in the classroom, and has reported that Father spanks her with an electrical cord. Additionally, Kimberly referenced being kept in a closet that "smelled really bad." The referral further alleged that Kimberly wears dirty and ill-fitting clothes on a daily basis, her shoes are always on the wrong feet, and she emits a foul odor that provokes comments from classmates. During a visit to the family residence, Mother and Father denied all the allegations. A Department investigator counted Mother's prescription schizophrenia medication tablets and based on the date of the prescription, the investigator determined Mother had not been taking her medication.

A Department investigator interviewed Kimberly at the children's assessment center. At first, Kimberly denied physical abuse but stated that Father "whoops" her and her sister when they misbehave. Later in the interview, Kimberly confirmed that there was physical abuse, but stated she did not feel good telling the interviewer about anything that goes on in the home because she "got in really bad trouble from the last [Department] case." Kimberly said she could not tell the interviewer if her parents argue because they would get "really, really mad at her." Kimberly was trembling in the chair during the interview.

A Department investigator spoke with Kimberly's school nurse, who said that Kimberly takes medication for emotional disturbance but Mother has failed to bring in Kimberly's medication on a consistent basis and does not respond to telephone calls. The nurse also told the investigator that she has concerns about Kimberly's hygiene and has spoken to Mother about it, but no changes have been made. The

4

nurse stated Kimberly's odor often becomes so disruptive that the school must wash her clothes on a daily basis.

Within three months of the first referral, the Department filed an emergency motion appointing the Department as temporary managing conservator of the girls, a motion to modify its previous conservatorship order, and requesting termination of the parents' rights. Initially, the girls were placed with a paternal aunt, but the Department eventually moved them to a foster home.

## II. Trial Proceedings

During his testimony, Father denied ever hitting Kimberly. According to Father, the only form of discipline he uses is restricting the girls' access to their toys and electronics. Father testified that he was aware that Kimberly had a hygiene issue when she was initially in foster care. Father acknowledged that the school contacted him and Mother about Kimberly's hygiene, but denied that Kimberly ever had a problem. Despite denying there was a problem, Father said that he and Mother took the girls to "Bath and Beyond" to buy them hygiene products and that they bought Kimberly a new school uniform. According to Father, he woke Kimberly every morning and made sure she took a shower before getting on the school bus. Father testified Kimberly wore clean clothes to school every morning.

Father admitted to assaulting Mother in 2011 but did not admit to assaulting Mother or either of the girls on any other occasion. Father testified that before Mother's schizophrenia diagnosis she would leave the house for days without an explanation. Father further testified that during therapy he learned more about Mother's schizophrenia, including that her diagnosis was not his fault. Upon questioning, Father admitted he thought it might have been his fault due to all the arguing, yelling, and screaming between the couple. According to Father, the reason the Department investigation first commenced in 2014 was due to Mother calling a

5

women's shelter because of a claim of abuse.

Next, Dempsey Spears, a licensed professional counselor specializing in children who have suffered physical or sexual abuse, testified as an expert. Spears explained that he had been working with Kimberly and Kandace on a regular basis for approximately six to seven months. According to Spears, a Department caseworker reached out to him concerning Kimberly's violent behavior, bedwetting, and hygiene problems. Kimberly's foster parent, who at the time was her paternal aunt, informed Spears that Kimberly acted aggressively and violently towards Kandace. Spears opined that Kimberly was "acting out the same behavior that was done to her." Spears believed Kimberly's violent behavior toward Kandace was a learned behavior. Spears further opined that Kimberly's severe bedwetting is consistent with children who suffer abuse and its resulting stress and anxiety. Spears testified that Kimberly's failure to ask permission to use the restroom in the classroom was a result of poor self-esteem.

Spears further testified that Kimberly disclosed to him that Father hits her for being disobedient. Spears confirmed that Kimberly never indicated Mother protected her from Father. Both Kandace and Kimberly told Spears that their parents often argue. Spears concluded that both girls have witnessed trauma, but it may not have affected Kandace's behavior because she was too young. Spears believes Kimberly has internalized the trauma. Spears did not believe family reunification would be in the girls' best interest. Spears was particularly troubled by the fact that the parents had already been through therapy, had the children removed, regained custody, and then lost the children a second time. Kimberly was reluctant to answer any questions about or discuss Father.

According to Spears, over the six to seven months he has been working with the girls, when they have been out of their parents' care, he has seen: Kimberly's

violent behavior toward Kandace reduced; Kandace's attention-seeking behavior reduced; and an overall increased bond between the sisters. Spears further testified that, aside from Kimberly occasionally soiling herself, he did not observe her to have any problems with her hygiene. Spears further testified that the girls told him they wanted to go home and that they missed Mother. Spears testified that he believes the girls truly love Mother.

Next, Kimberly's special education teacher, Aisha Toote, testified. Toote testified Kimberly wore a white polo-style shirt with a chocolate milk stain on it for three or four days in a row the first week of school. Kimberly would hide her schoolwork from Toote or erase an entire page of work before allowing Toote to look at her paper. According to Toote, personal hygiene was an issue every single day. Kimberly regularly arrived at school giving off a disruptively foul odor. The school would give Kimberly uniforms that fit, but the next day, she would return to school in a dirty and very ill-fitting uniform. Toote testified that Kimberly's shoes were on the wrong foot every single day. Toote testified she would take Kimberly to the nurse's office to change her into a clean uniform, but often at the end of the day Kimberly would insist on changing back into the dirty uniform because she feared she would "be in trouble" when she arrived home.

On one occasion, Toote went to Kimberly's home to remind Mother about a meeting they had that afternoon. After she knocked on the door of the residence for approximately twenty minutes, Mother and Father answered the door. Toote asked Mother whether she was going to attend the meeting. Mother said nothing and looked to Father. Then Mother said she would come to the meeting. Toote informed Mother they needed to discuss Kimberly's clothing and hygiene. Mother responded that she would take Kimberly to Bed, Bath, and Beyond to purchase lotions and creams. Father then said to Toote, "I resent you coming to my house, knocking on

my door, and complaining about [Kimberly]. What right do you have to do that?" The parents did not show up to the meeting.

Next, Kimberly's fourth grade teacher, Lisa St. Clair, testified. St. Clair testified that Kimberly would come into school crying most mornings because other students on the school bus would pick on her due to her clothes and her smell. St. Clair testified about an instance in February 2017 when Kimberly told St. Clair that Father had hit her and her nose would not stop bleeding. St. Clair asked Kimberly if anyone tried to help her and Kimberly responded that her Mother tried to make the bleeding stop. Kimberly also told St. Clair that Father spanked her with an extension cord. Additionally, Kimberly told St. Clair about a closet at home that was "really dark and smelly" in reference to ways in which she was disciplined.

Next, another one of Kimberly's fourth grade teachers, Kelly Martinez, testified. Martinez testified that Kimberly's clothes were dirty and ill-fitting, even though the school washed her clothes during the day and sent her home in clean clothes. According to Martinez, Kimberly was scared to fix her shoes and put them on the right feet. Martinez testified that Mother told the school counselor she would have to check with Father about whether it was okay to take care of Kimberly's hygiene. Martinez testified about an incident where Kimberly arrived at school visibly upset and when Martinez asked her why, Kimberly said it was because she got in trouble for waking up her parents that morning.

Next, Jonathan Beauford, a Department Investigator, testified. Beauford received an allegation of physical abuse of Kimberly by Father in February of 2017. Specifically, it was alleged that Father punched Kimberly in the nose and that Kimberly had hygiene problems. When Beauford interviewed Kimberly, she told him Father hit her because she dropped a cellular telephone. Additionally, she told him that Father whipped her with a cord. Kimberly did not indicate that Mother did

8

anything to protect her from Father. Beauford testified that he spoke with the parents outside the home because they would not let him enter their residence. Father denied the allegations. Mother denied the allegations of physical abuse and told Beauford that she ensures Kimberly is bathed and clean before school each day. Beauford testified that he went unannounced to visit Kimberly at school and he observed her to be wearing clean clothes without any noticeable hygiene problems.

Next, Mother testified. Mother denied Father ever hit her in the face; instead, she characterized the 2011 assault as a scratch. Mother stated that this was the only physical altercation the couple ever had. Mother testified about her criminal trespass convictions that occurred in 2014 while the children were in foster care. According to Mother, she was suffering from the symptoms of undiagnosed schizophrenia wherein she could not think clearly, and she heard voices in her head telling her to go into the locations, which resulted in her trespass charges.

Mother explained that Father was primarily responsible for preparing Kimberly for school each morning. Mother testified that she laundered the family's clothes on a weekly basis. Mother further testified that she turned the water on in the shower for Kimberly every morning and confirmed that Kimberly took a shower before school. Mother testified that Kimberly can be reluctant to take care of her personal hygiene. Kimberly told Mother that in the foster home they did not make her shower on a daily basis. Mother testified that despite this, she insisted that Kimberly shower every morning.

Mother admitted she only went to one parent-teacher meeting and attended one by telephone over the course of Kimberly's third and fourth grade years, even though Kimberly was in special education classes and there were ample parent-teacher meetings.

Mother further testified that she was the one who informed the school

counselor that Kimberly was being bullied. Mother stated that the clothing provided by the school was ill-fitting. Mother testified that when Toote came to visit the home she was very aggressive and was banging on the windows. According to Mother, Toote said "your daughter smells." Mother said she told Toote she would not be able to make it to the meeting and requested to do it over the phone instead, but the school did not allow it. Mother also testified that Kimberly has a tendency to lie and hide things, such as her homework. Mother further testified that she does not believe Kimberly is afraid of Father. Mother testified that she does not need to protect Kimberly from Father because he is a good father. When asked whose fault it was that the children were being removed for a second time, Mother replied that it was her own fault. She explained that it was her fault because she called the women's shelter and told them a lie. Mother testified she lied to the women's shelter when she informed them that the children had witnessed domestic abuse. Mother said she punishes Kimberly by sending her to her room. Mother testified that she is protective over her children and would never allow someone to hit either of them.

Finally, Department caseworker Ciara Batchan testified. Batchan testified that the supervised visits between Mother, Father, and the girls are appropriate. Batchan has visited the parents' home and believes it is appropriate for the girls. Batchan further testified that she has seen great improvement in the relationship between the sisters since they have been out of their parents' home.

At the time of trial, the girls were in foster care and, according to Batchan, "love it." There have been no reports of Kimberly wetting the bed in her new foster home. Kimberly's new school has not made complaints about her hygiene. At the time of trial, the girls had only been in their new placement for one month. The new foster parent had expressed interest in long-term placement. However, Batchan testified that there are some complications regarding the licensing of the potential

foster parent. Batchman then said, "well, we have a — a actual teacher from the girls
—" and then the trial court stopped her from revealing any more specific information.
Batchman was allowed to testify, however, that an individual reached out to the
Department about permanently adopting the girls. Batchman testified that the
Department was conducting a home study on the potential placement at the time of
trial.

Batchan further testified that Mother has continually failed to accept
responsibility for the allegations by denying that Kimberly has hygiene problems
and by denying that domestic violence exists in the home. According to Batchan, the
Department had been notified by the school nurse that Mother had not signed a
consent form for Kimberly's medication. Batchan testified that she believed it would
be in the best interest of both girls if both of their parents' rights were terminated.

The trial court signed a final order modifying a prior order and decree
terminating Mother's and Father's parental rights and appointing the Department
sole managing conservator of Kimberly and Kandace. The trial court found Mother
and Father engaged in conduct described in subsections (D) and (E) of section
161.001(b)(1) of the Family Code. The court additionally found termination of
Mother's and Father's parental rights was in the best interest of Kimberly and
Kandace. This appeal followed.

## ANALYSIS

### I. Burden of Proof and Standard of Review

Parental rights can be terminated upon clear and convincing evidence that (1)
the parent has committed an act described in section 161.001(b)(1) of the Family
Code and (2) termination is in the best interest of the child. Tex. Fam. Code §
161.001(b)(1), (2); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009).

11

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *See In re G.M.*, 596 S.W.2d 846, 846 (Tex. 1980); *In re S.R.*, 452 S.W.3d 351, 357 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Although parental rights are of constitutional magnitude, they are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). The child's emotional and physical interests must not be sacrificed merely to preserve the parent's rights. *Id.*

Due to the severity and permanency of the termination of parental rights, the burden of proof is heightened to clear and convincing evidence. Tex. Fam. Code. § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *accord In re J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a heightened standard of review. *In re S.R.*, 452 S.W.3d at 358. "But the constitutional and statutory requirement that parental rights cannot be terminated unless grounds for termination are established by clear and convincing evidence necessarily means that the ultimate burden of proof based on clear and convincing evidence remains with the party seeking to terminate the parental rights." *In re L.M.I.*, 119 S.W.3d 707, 720 (Tex. 2003).

In reviewing the legal sufficiency of the evidence in a termination case, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *See In re J.O.A.*, 283 S.W.3d at 344; *In re J.F.C.*, 96 S.W.3d at 266. We assume the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence a reasonable fact finder could have disbelieved. *In re J.O.A.*, 283 S.W.3d at 344; *In re J.F.C.*, 96 S.W.3d at 266.

In reviewing the factual sufficiency of the evidence, we consider and weigh all the evidence, including disputed or conflicting evidence. *See In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.F.C.*, 96 S.W.3d at 266. We give due deference to the fact finder's findings, and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam). The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id*. at 109. We are not to "second-guess the trial court's resolution of a factual dispute by relying on evidence that is either disputed, or that the court could easily have rejected as not credible." *In re L.M.I.*, 119 S.W.3d at 712.

## II. Predicate termination grounds

The trial court made predicate termination findings as to Mother in regard to both Kimberly and Kandace under subsections (D) and (E) of section 161.001(b)(1); and predicate termination findings as to Father in regard to Kandace under subsections (D) and (E) of section 161.001(b)(1). Only one predicate finding under section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the children's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). We begin by addressing the trial court's finding under subsection (E).

Termination of parental rights is warranted under this subsection (E) if the Department proves by clear and convincing evidence, in addition to the best-interest finding, that a parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code § 161.001(b)(1)(E). "Conduct" under subsection

13

(E) includes acts, omissions, or failures to act. *In re A.L.H.*, 515 S.W.3d 60, 91 (Tex. App.—Houston [14th Dist.] 2017, pet. denied). In this context, endanger means "to expose to loss or injury; to jeopardize." *In re T.N.*, 180 S.W.3d 376, 383 (Tex. App.—Amarillo 2005, no pet.) (*quoting In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam)). It is not necessary that the parental misconduct be directed at the child, occur in the child's presence, or that child actually suffer injury from it. *Walker v. Tex. Dept. of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

Evidence of domestic violence may be considered as evidence of endangerment under subsection (E). *In re K-A.B.M.*, 551 S.W.3d 275, 286 (Tex. App.—El Paso 2018, no pet.). A parent's abusive or violent conduct can produce a home environment that endangers a child's well-being. *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.). Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment. *Id.*; see *In re M.R.*, 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.) (considering the fact that mother "exposed her children to domestic violence," including incident where mother was "smacked" in front of child, as evidence of endangerment under subsection (E)); *see also Sylvia M. v. Dallas County Welfare Unit*, 771 S.W.2d 198, 204 (Tex. App.—Dallas 1989, no writ) (considering "volatile and chaotic" marriage altercation during pregnancy and mother's repeated reconciliation with abusive spouse). Violent conduct by a parent toward the other parent may produce an environment that endangers the physical or emotional well-being of a child. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.).

### 1. Mother

Mother exposed her daughters to an abusive relationship. The record reflects

14

Father hit Mother on multiple occasions, including when she was pregnant with Kandace, and Mother has stayed in the relationship. The children's therapist testified that Kimberly told him there was often arguing between her parents. Kimberly informed multiple adults that she feared Father, but Mother testified that Father is a good father and she does not believe Kimberly. Mother has not protected her daughters from Father's alleged abuse or from witnessing the arguments between Mother and Father. Furthermore, Mother has failed to respond to the school's pleas for her to address Kimberly's hygiene, which results in ostracization from classmates. Kimberly's emotional well-being has been disrupted by Mother's neglect of her hygiene. Moreover, Mother has failed to provide the school with Kimberly's emotional disturbance medication.

The Department investigator provided evidence that Mother has not been taking her schizophrenia medication, thus subjecting the children to unpredictable behavior. Father testified that when Mother's schizophrenia was undiagnosed, she would leave the house for days at a time. Additionally, one of the Department referrals alleged Mother attempted to "overdose" on pills. "[W]hen a parent's mental state allows her to engage in conduct which endangers the physical or emotional well-being of the child, that conduct has bearing on the advisability of termination the parent's rights." *In re J.I.T.P.*, 99 S.W.3d at 845 (quoting *In re C.D.*, 664 S.W.2d 851, 853 (Tex. App.—Fort Worth 1984, no writ)) (considering mother's schizophrenia and resulting suicidal thoughts, hospitalizations, and violence.).

The trial court could have found that Mother's inaction, including her failure to protect the girls from Father, her failure to address Kimberly's hygiene, her failure to provide Kimberly with her medication, her failure to take her own medication, and her failure to shield the girls from fighting between her and Father produced an environment that endangered the physical and emotional well-being of her

daughters. *See In re J.I.T.P.*, 99 S.W.3d at 845 (concluding that a mother's mental state in addition to domestic violence between the parents supported a finding of endangerment).

Reviewing all the evidence in the light most favorable to the termination finding under subsection (E), we conclude that a reasonable fact finder could have formed a firm belief or conviction as to the truth of the finding that Mother's conduct endangered Kimberly and Kandace. *In re J.O.A.*, 283 S.W.3d at 344. Having reviewed the entire record, we conclude the disputed evidence is not so significant that the trial court, as fact finder, could not have formed a firm belief or conviction that Mother's conduct endangered Kimberly and Kandace. *In re J.F.C.*, 96 S.W.3d at 266. We conclude the evidence is legally and factually sufficient to support the predicate termination finding under subsection (E).

Having concluded the evidence is legally and factually sufficient to support the trial court's finding under subsection (E), we need not review the sufficiency of the evidence to support the subsection (D) finding. *See In re A.V.*, 113 S.W.3d at 362. We overrule Mother's first issue.

### 2.    Father

Father has confirmed violent propensities. He has admitted to assaulting Mother. There are a number of alleged assault incidents against Mother. Although Mother and Father both deny the assaults occurred, it was within the purview of the trial court to determine the credibility of the witnesses. *See In re K.A.S.*, 131 S.W.3d 215, 229 (Tex. App.—Fort Worth 2004, pet. denied). Moreover, Kimberly informed a teacher, her therapist, and a department investigator that Father hit her in the nose and struck her with an electrical cord. Dempsey Spears, Kimberly's therapist, testified that Kimberly's behavior is consistent with that of a child who has suffered physical abuse. Kimberly further informed a department investigator and Spears that

16

Father hits Kandace and has picked her up by her collar. Father's abuse of Kimberly and Mother created an environment which endangered Kandace's physical and emotional well-being. As stated above, it is not necessary that the parent's conduct be directed at the child or that the child actually suffer injury in conducting a review under subsection (E). *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Reviewing all the evidence in the light most favorable to the termination finding under subsection (E), we conclude that a reasonable fact finder could have formed a firm belief or conviction as to the truth of the finding that Father's conduct endangered Kandace. *In re J.O.A.*, 283 S.W.3d at 344. Having reviewed the entire record, we conclude the disputed evidence is not so significant that the trial court, as fact finder, could not have formed a firm belief or conviction that Father's conduct endangered Kandace. *In re J.F.C.*, 96 S.W.3d at 266. We conclude the evidence is legally and factually sufficient to support the predicate termination finding under subsection (E).

Having concluded the evidence is legally and factually sufficient to support the trial court's finding under subsection (E), we need not review the sufficiency of the evidence to support the subsection (D) finding. *See In re A.V.*, 113 S.W.3d at 362. We overrule Father's first issue.

## III.   Best Interest

Termination must be in the child's best interest. Tex. Fam. Code § 161.001(b)(2). There is a strong presumption that the best interest of a child is served by keeping the child with the child's parent. *Id*. § 153.131(b); *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). Prompt, permanent placement of the child in a safe environment is presumed to be in the child's best interest. See Tex. Fam. Code § 263.307(a).

17

Courts may consider the following non-exclusive factors in reviewing the sufficiency of the evidence to support the best-interest finding: the desires of the child; the physical and emotional needs of the child now and in the future; the emotional and physical danger to the child now and in the future; the parental abilities of the persons seeking custody; the programs available to assist those persons seeking custody in promoting the best interest of the child; the plans for the child by the individuals or agency seeking custody; the stability of the home or proposed placement; acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); see also Tex. Fam. Code § 263.307(b) (listing factors to consider in evaluating parent's willingness and ability to provide the child with a safe environment). As noted, this list of factors is not exhaustive, and evidence is not required on all the factors to support a finding that termination is in the child's best interest. *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.).

Mother and Father contend termination of their parental rights was not in the best interest of Kimberly and Kandace. The Department responds that the best-interest finding is supported by the evidence.

### 1. The physical and emotional danger to the children now and in the future

The evidence supporting termination under one of the grounds listed in section 161.001(b)(1) can also be considered in support of a finding that termination is in the best interest of the child. *See In re C.H.*, 89 S.W.3d at 27 (holding the same evidence may be probative of both section 161.001(b)(1) grounds and best interest). A trial court may infer that past endangering conduct may occur again in the future if the child is returned to the parent. *In re J.B.*, 436 S.W.3d 105, 118 (Tex. App.—

18

Houston [14th Dist.] 2014, no pet.). The evidence offered at trial included Kimberly's reports of abuse suffered in the care of Mother and Father. Further, Mother has proven that she will stay with Father despite his alleged abusive behavior. Mother does not presently, and will likely not in the future, protect the girls from Father's alleged abuse. Further, Father and Mother have failed to remedy Kimberly's hygiene problems, despite the school bringing it to their attention on multiple occasions. While Mother and Father disputed the evidence of abuse and neglect, the fact finder had discretion to determine the weight and credibility of Mother's and Father's testimony. *See In re K.A.S.*, 131 S.W.3d at 229-30. We may not disturb the fact finder's resolution of credibility issues. *See In re H.R.M.*, 209 S.W.3d at 108; *In re L.M.I.*, 119 S.W.3d at 712.

### 2. The parental abilities of the individuals seeking custody

We may consider a parent's past performance in evaluating their fitness to provide for the children and the trial court's determination that termination would be in the children's best interest. *See In re C.H.*, 89 S.W.3d at 28; see also Tex. Fam. Code § 263.307(b)(12). Although evidence of past misconduct or neglect alone may not be sufficient to show present lack of fitness, a fact finder may measure a parent's future conduct by her past conduct to determine whether it is in the children's best interest to terminate her parental rights. *See In re A.N.D.*, No. 02-12-00394-CV, 2013 WL 362753, at *2 (Tex. App.—Fort Worth Jan. 31, 2013, no pet.) (mem. op.).

The Department caseworker testified that the parent's home is appropriate for the children. Father testified that has been employed in the same job for five years. The parents' ability to provide a stable residence has never been an issue in this case. The alleged on-going neglect and abuse that takes place in the home may have led the trial court to reasonably conclude Mother and Father lack parental fitness. According to Kimberly's teachers, despite on-going efforts by the school, Mother

19

and Father have not been able to send Kimberly to school in clean clothes and adequately bathed. Father completed the domestic abuse programs and counseling programs required by the Department and the terms of his community supervision, but according to Kimberly, Father's abusive behavior continues. Mother blames herself for the girls' removal from the home because she claims she was lying when she called the women's shelter. Mother has not displayed any aptitude for protecting her daughters from Father's alleged abuse. Kimberly is already demonstrating severe emotional consequences as a result of her parents' care or lack thereof. Kandace may suffer the same consequences if she is allowed to remain with Mother and Father.

### 3. Desires of the children

Kimberly and Kandace both told their therapist that they love and miss Mother. Kimberly stated she was afraid of Father and was reluctant to discuss him. According to the therapist, Kandace did not say much about Father, other than that Father and Mother argue. Although a child's love of a parent is a very important consideration in determining the best interest of the children, it cannot override or outweigh evidence of danger to the child, nor can it compensate for the lack of an opportunity to grow up in a normal and safe way equipped to live a normal, productive, and satisfying life. *In re D.S.*, No. 02-15-00350-CV, 2016 WL 1267808, at *8 (Tex. App.—Fort Worth Mar. 31, 2016, no pet.) (mem. op.). While the girls clearly love their Mother, it is not in their best interest to stay in a home where there is alleged domestic violence and reported neglect.

In summary, the record contains sufficient evidence to support the best-interest findings based on Mother's failure to protect the girls from Father's alleged abuse; Mother's and Father's continued domestic disputes; Mother's and Father's neglect of Kimberly's reported hygiene problems; Father's alleged and confirmed physical assault of Mother; and Father's alleged physical abuse of Kimberly. After

20

considering the relevant factors under the appropriate standard of review, we hold the evidence is legally and factually sufficient to support the trial court's finding that termination of the parent-child relationship is in Kimberly's and Kandace's best interest. We overrule Mother's and Father's second issues.

## CONCLUSION

Having overruled Mother's and Father's issues presented on appeal, we affirm the trial court's judgment.

/s/    Martha Hill Jamison
        Justice

Panel consists of Chief Justice Frost and Justices Jamison and Donovan.